**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**IN RE L.A.V.F.**

JUAN ANTONIO VÁZQUEZ ÁLVAREZ,

PETITIONER,

vs. Case No.: ________________

DIEGA ESMERALDA FUENTES RICO,

RESPONDENT.
____________________________/

**VERIFIED PETITION, PURSUANT TO THE HAGUE CONVENTION, FOR RETURN OF CHILD TO THE COUNTRY OF HABITUAL RESIDENCE**

Petitioner, Juan Antonio Vázquez Álvarez (the "Father"), by and through undersigned counsel, files this Verified Petition seeking the return of his four-year-old son, *L.A.V.F.*[1], to his country and place of habitual residence in Mexico. Respondent, Diega Esmeralda Fuentes Rico (the "Mother"), is wrongfully retaining L.A.V.F. in the United States in violation of the Father's custody rights under Mexican law. This Court should order the prompt return of L.A.V.F. to Mexico pursuant to the Hague Convention[2] on the Civil Aspects of International

---

[1] In compliance with Federal Rule of Civil Procedure 5.2(a), only L.A.V.F.'s initials are included in this Verified Petition and his name has been redacted from all exhibits. Also, only L.A.V.F.'s year of birth will be disclosed.
[2] Petitioner uses the term "Hague Convention," or, simply "the Convention," to refer to the Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980, and incorporated into the laws of the United States through the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq*.

Child Abduction (the "Hague Convention"), as implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq*.

# I. FACTUAL BACKGROUND

1. The Father attaches to this Petition, as **Exhibit A,** a copy of the formal Request for Assistance under the Hague Convention which the United States Department of State transmitted to the undersigned counsel. Exhibit A contains some documents within the Request for Assistance the Father submitted to the Mexican *Secretaría de Relaciones Exteriores* ("SRE"), Mexico's foreign affairs ministry, which is Mexico's Central Authority under the Convention.

2. L.A.V.F. was born in 2022, in Tampa, Hillsborough County, Florida, [**Ex. A-2**[3] (PDF page 11)] and the Father attended the birth. L.A.V.F. is a dual citizen of the United States and Mexico. *See* Mexican passport, attached as **Exhibit B**. His parents arranged for his birth in the United States so that he would obtain United States citizenship, then returned to Mexico to raise him there. *See* **Ex. A-3** (Mexican birth certificate); Mexican *Inscripción de Nacimiento* (Registration of Birth), attached as **Exhibit C**.

3. Petitioner, Juan Antonio Vázquez Álvarez, is a citizen and national of the United Mexican States and L.A.V.F.'s father. He was born in Toluca de Lerdo, Mexico City, Mexico. *See* Translation of Marriage Certificate with Mexican original appended, **Ex. A-4**. He currently resides in Tulum, Quintana Roo, Mexico, where

[3] Bookmarks have been placed in the PDF of Exhibit A.

he works as a real estate agent. The Father does not possess a current United States visa[4] and thus is unable to travel to the United States.

4. Respondent, Diega Esmeralda Fuentes Rico, is a citizen and national of the United Mexican States and L.A.V.F.'s mother. She was born in Quiroga, Michoacán, Mexico. *See* Translation of Marriage Certificate with Mexican original appended, **Ex. A-4**. The Mother is a lawful permanent resident (Green Card holder) of the United States.

5. The Father and Mother were married on December 23, 2020, in Quiroga, Michoacán, Mexico. *See* Translation of Marriage Certificate with Mexican original appended, **Ex. A-4**. They remain married, although shortly before taking L.A.V.F. to the United States, the Mother surreptitiously filed a divorce petition in Mexico.

6. Shortly after L.A.V.F.'s birth, the family returned to Mexico. L.A.V.F. lived continuously in Mexico from that time until his departure on June 30, 2026—a period of more than four years – apart from brief family trips to the United States. His home, family, school, friends, and daily life are all there. Mexico was the only country in which he had any meaningful or sustained life experience.

7. Neither the Father nor the Mother is a citizens of the United States. The Mother and the material grandparents have currently valid visas to be in the

[4] The Father will be applying for an emergency visa for permission to travel to the United States in order to attend the court proceedings in this case, but there is no guarantee that the United States government will grant a visa to him.

United States, commonly known as "green cards." The maternal grandparents live in Quiroga, Michoacán, Mexico and also regularly visit Polk County, Florida.

8. In 2023, the Mother traveled with L.A.V.F. to the United States for two weeks, without the Father, and returned to Mexico as planned. Likewise, in 2024, the Mother traveled without the Father to the United States, took the child with her, and returned with the child as agreed. The last time the Father traveled to the United States with his wife and son was in January 2025. Although the Father previously has had a visa entitling him to travel to the United States, he does not currently have one.

9. The family lived together in the Tulum and Riviera Maya area of the Mexican state of Quintana Roo, where L.A.V.F. attended preschool at the *Colegio Internacional Alemán de la Riviera Maya* ("German School") during the 2024–2025 school year. *See* Photos taken at the German School, attached as **Exhibit D**; German School diplomas, attached as **Exhibit E**.

10. In 2025, the Mother unilaterally took L.A.V.F. to live with her parents in Quiroga, Michoacán, Mexico, for what was initially described as a temporary visit, and then decided to remain there. She enrolled L.A.V.F. at the *Jardín de Niños Mundo Infantil* ("Kindergarten") in Quiroga, Michoacán for the entire 2025–2026 school year. *See* Photos taken at the Kindergarten, attached as **Exhibit F**.

11. Although Quiroga, Michoacán is far from Tulum (approximately 1900 miles), in addition to frequent phone and video calls, the Father traveled regularly

from Tulum to Quiroga to be with his son, participated in his upbringing, provided financial support for the child and family, attended school events—including the June 26, 2026, Father's Day celebration at the Kindergarten—and continued to build "Casa L[redacted]" in Quiroga, as the family's permanent home in Mexico. *See* Photos attached as Exhibit F.

12. Unbeknownst to the Father, the Mother filed a divorce proceeding in the Mexican courts in Michoacán. The Father did not learn of that proceeding until September 2026, after the mother had failed to return L.A.V.F. to Mexico.

13. In order to establish the Mexican court's jurisdiction over her divorce petition, the Mother represented to the Mexican court that she is a native and resident of Quiroga, Michoacan, Mexico and attached a Certificate of Origen and Residence and her Voter Registration Card as proof. *See* Mother's filing with Mexican court, with English translation, attached as **Exhibit G**.

14. The Father did not know about the existence of the Mexican divorce case at the time he completed his Hague Convention application. Subsequently, on August 28, 2026, the Mother's Mexican attorney, Martha Soto, contacted the Father outside of formal legal channels suggesting that the Father meet with her or look into the proceedings himself. This prompted the Father to seek legal counsel in Mexico. On September 22, the Father formally accepted service of process of the Mexican divorce papers.

15. On or about June 4, 2026, the Mexican court issued an order denying the Mother's request to take L.A.V.F. abroad. *See* June 4, 2026, Mexican Court

Order, with English translation, attached as **Exhibit H**. Specifically, the Court said (with emphasis in original):

| Spanish | English translation |
|---|---|
| Por otra parte, digasele que por lo que ve a la medida urgente que solicita autorizaci6n judicial para poder llevar a su menor hijo a Estados Unidos de Norte America, digasele que no ha lugar, toda *vez* que la **medida urgente en materia familiar** (o medida provisional/precautoria) es una resoluci6n judicial inmediata disefiada para proteger la integridad fisica, emocional o patrimonial de los miembros de una familia mientras se resuelve un juicio principal, sin que la que solicite se contemple como medida urgente en el Código Familiar, maxime que lo que pretende es un cambio de residencia del menor, para lo cual se ordena dar vista a la parte demandada para que se pronuncie al contestar la demanda. | Furthermore, with respect to the urgent measure in which she requests judicial authorization to take her minor son to the United States of America, she is informed that the request is denied (no ha lugar), since an **urgent measure in family matters** (or provisional/precautionary measure) is an immediate judicial resolution designed to protect the physical, emotional, or property integrity of family members while a main proceeding is resolved, and what she requests is not provided for as an urgent measure in the Family Code; all the more so since what she seeks is a change of the minor's residence, for which it is ordered that notice be given to the defendant so that he may state his position when answering the complaint |

16. Thus, the Mexican court's order confirmed that both parents possess custody rights under Mexican law and that neither parent could unilaterally change the child's country of residence. Indeed, the Mother was expressly ordered by the Mexican court to not take L.A.V.F. from Mexico without the Father being given notice of the divorce proceeding and the ability to respond.

17. Having been denied permission by the Mexican court to take L.A.V.F. to the United States, the Mother did *not* comply with that court's order. Rather, on June 25, 2026 – without revealing the divorce proceeding or her denied request to take L.A.V.F. to live in the United States – the Mother approached the Father for written permission to travel with L.A.V.F. to the United States, as they had done

in the past. This time the trip would last two to three weeks, but no more than four weeks, so the Mother could renew certain documents (such as her Florida driver's license) and so L.A.V.F. could visit his maternal grandparents, who had been staying in Polk County since April 2026.

18. The agreement was for a visit, and L.A.V.F. would return to Mexico before the start of the school year. There was never an agreement to change L.A.V.F.'s home or country of residence. However, the Mother asked that the written permission to travel not specify a return date because her exact travel itinerary had not yet been fixed.

19. The Mother's parents frequently visit Polk County, Florida, and traveled there in April 2026. The Mother has other relatives who live in other states within the United States. Because the Mother had previously traveled with the child to the United States without incident, the Father thought the request was innocent. The next day, June 26, 2026, the Father executed a notarized travel authorization before Notary Public No. 157, Lic. Raúl Cristhian Nava Vallejo, in Quiroga, Michoacán, Mexico. The travel authorization was prepared by the notary, based on a form the parents had used for the Mother's prior travel in 2023. The authorization permitted the Mother to travel with L.A.V.F. from Mexico to the United States for a temporary visit. It referenced the Father's parental authority (*patria potestad*) under Articles 414 and 420 of the Federal Civil Code of Mexico. The authorization was limited to departure from Mexico; it did not authorize

permanent relocation. *See* Travel Authorization in Spanish, attached as **Exhibit I**, with translation into English attached as **Exhibit J**.

20. If the Father had known about the Mexican divorce case, the Mother's request to relocate the child to the United States, or the June 4, 2026, order from the Mexican court, he would not have signed the travel authorization.

21. Believing that they were only taking a temporary trip, on June 30, 2026, the Father personally drove the Mother and L.A.V.F. to the Mexico City airport for their departure aboard Volaris Flight 780 to Orlando, Florida. Conforming with the parents' agreement that L.A.V.F. would return to Mexico for the school year, the immigration form the Mother completed at departure declared a stay of only two months. *See* Mexican immigration form for L.A.V.F., with English translation, attached as **Exhibit K**.

22. During the first two weeks of July 2026, the Father communicated regularly with the Mother about L.A.V.F.'s welfare and anticipated return to Mexico but never received an answer to his questions about their return date. *See* **Ex. A-9-12**. *See also* English translations of emails, texts, and messages, attached as **Exhibit L.**[5]

23. By early-July, the Mother began evading the Father's inquiries and stopped cooperating with arrangements for L.A.V.F.'s return. Also by mid-July

[5] In Mexico, numeric months and days are reversed from the format used in the United States. For example, the date of July 9, 2026 is indicated in Mexico as "09/07/233," whereas it is indicated as "07/09/26" in the United States. The translation keeps the Mexican date format.

2026, the Mother slowed her cooperation with the Father about communications with L.A.V.F. *See* Ex. L at 4, 8-11, 12, 41-45.

24. In August, without the Father's knowledge or consent, the Mother enrolled L.A.V.F. in a Catholic school, Saint Anthony Catholic Church at 820 Marcum Road, Lakeland, Polk County, Florida 33809 for the 2026–2027 school year.

25. The Mother has told the Father that she intends to remain in the United States with L.A.V.F. indefinitely and will not return him to Mexico.

26. The Father is unable to visit L.A.V.F. because he does not have a current visa to enter the United States. Over the course of L.A.V.F.'s stay in Polk County, the Father's ability to communicate via phone and video with L.A.V.F. has been decreased. The Mother has purposefully severed the Father's ability to communicate and interact in person with L.A.V.F., and she has greatly limited the Father's long-distance communication via phone and video.

27. Despite the Father's objections and repeated requests to bring L.A.V.F. back to Mexico, the Mother has not returned L.A.V.F. to Mexico.

28. The Father also immediately objected through official channels. On July 31, 2026, he contacted the Secretaría de Relaciones Exteriores ("SRE"), Mexico's foreign affairs ministry, which is Mexico's Central Authority under the Convention. The Father completed a formal application for return of L.A.V.F. on August 11, 2026. *See* Authorization for Mexican government to submit return request to the United States, attached as **Exhibit M**.

29. The SRE transmitted his application to the United States Department of State, Office of Children's Issues, which serves as the United States' Central Authority. A copy of that application is attached as Exhibit A and other exhibits hereto.

30. On August 18, 2026, the United States Department of State transmitted a voluntary-return letter to the Mother, asking the Mother to return L.A.V.F. to Mexico. *See* **Ex. A-14**. She has refused to do so.

## II. PETITION FOR THE RETURN OF L.A.V.F. TO MEXICO.

31. The Father now brings this Verified Petition before the Court pursuant to 22 U.S.C. § 9003(b), within three months after the wrongful retention and well within the one-year period prescribed by Article 12 of the Convention.

32. This is a treaty-enforcement case, not a custody dispute. Under the Hague Convention, the Court is not asked to decide which parent would be the better custodian. Rather, it is asked to enforce an international treaty requiring the prompt return of a child to the country where custody decisions should be made. As the Supreme Court has explained, "[t]he Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence." *Abbott v. Abbott*, 560 U.S. 1, 20 (2010).

33. To obtain the return of L.A.V.F. under the Hague Convention, the Father must establish by a preponderance of the evidence:

i. L.A.V.F. is under the age of sixteen;

ii. L.A.V.F.'s habitual residence immediately before the wrongful retention was in Mexico;

iii. The Mother's retention of L.A.V.F. in the United States breaches the Father's custody rights under Mexican law;

iv. The Father was actually exercising those custody rights at the time of the wrongful retention; and

v. No applicable exception to the obligation of return applies.

As set forth below, the Father satisfies every element.

## III. JURISDICTION AND VENUE

34. This Court has original jurisdiction over this action pursuant to 22 U.S.C. § 9003(a), which grants federal district courts original concurrent jurisdiction over actions arising under the Hague Convention.

35. The Mother has told the Father that she and L.A.V.F. are living in a mobile home or trailer on a rural lot at [redacted], Mulberry, Florida 33860, located in Polk County. She also sent him a copy of a prescription for eyeglasses that lists the same address. *See* **Exhibit P**. Upon information and belief, an employer of the material grandfather owns the Mulberry property. Videos and photos of the child confirm his presence inside a mobile home or recreational vehicle. The Mother's parents also regularly stay at a house in Polk County, Florida. The Catholic school in which L.A.V.F. is reported to be enrolled is located in Lakeland, Polk County, Florida. On October 28, 2026, that school posted

a photograph on its Facebook page in which L.A.V.F. is one of three students seated at a table.[6] Thus, the child is located in Polk County, Florida, which is located within the Tampa Division of the Middle District of Florida.[7]

36. The Father respectfully requests that the Court order the Mother to confirm L.A.V.F.'s current address and disclose any change in location pursuant to 22 U.S.C. § 9004(a).

37. Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391(b)(2) because L.A.V.F. is located within this judicial district and a substantial part of the events giving rise to this claim—specifically, the Mother's wrongful retention of L.A.V.F.—occurred in the Middle District of Florida.

38. If the Court determines that L.A.V.F. is located in another judicial district in Florida, the Father respectfully requests that the Court order disclosure of the address and transfer this action to the appropriate district rather than dismissing it, because the child is indisputably within Florida and the United States.

## IV. ARGUMENT

The Hague Convention, implemented in the United States by ICARA, 22 U.S.C. § 9001 *et seq.*, provides a prompt civil remedy for children wrongfully

---

[6] The photograph is attached as **Exhibit Q** and can be accessed online at https://www.facebook.com/photo?fbid=1605037931665649&set=pcb.1605038081665634, last accessed November 2, 2026.

[7] The United States Department of State confirmed that the Mother receives mail at [redacted], Fort Pierce, Florida 34981, in St. Lucie County, within the Fort Pierce Division of the Southern District of Florida. The residence is listed as belonging to Omar Rico, whom the Father believes is a relative of the Mother. There is no evidence the child is located at the Fort Pierce address.

removed from or retained outside their country of habitual residence. Article 12 makes return mandatory: When removal or retention is wrongful, the judicial authority "shall order the return of the child forthwith." Convention art. 12.

Article 3 defines wrongful removal or retention as conduct that breaches custody rights under the law of the child's habitual residence and occurs when those rights were actually exercised or would have been exercised but for the removal or retention. Convention art. 3. Article 5 defines "rights of custody" to include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention art. 5(a). The Supreme Court has confirmed that the *ne exeat* right—the right to consent before a child is taken from the country—is a "right of custody" under the Convention. *Abbott v. Abbott*, 560 U.S. 1, 10–11 (2010).

### A. L.A.V.F. Has Been Wrongfully Retained Since July 31, 2026

The Father authorized only a temporary trip of two to four weeks. The notarized travel authorization executed on June 26, 2026, before Notary Public No. 157, authorized the Mother to depart Mexico with L.A.V.F. It did not authorize permanent relocation to the United States. The Mother's immigration form declared a two-month stay. The Father personally drove the Mother and child to the airport, consistent with his understanding that the trip was temporary.

Consent to a temporary visit is not consent to permanent relocation or indefinite retention. *See Walker v. Kitt*, 900 F. Supp. 2d 849, 856 (N.D. Ill. 2012) (holding that a parent's agreement to allow a child to visit the United States for a

limited period did not extend to indefinite retention, and that refusal to return the child after the agreed period constituted wrongful retention under the Convention); *Moreno v. Martin*, No. 08-22432-CIV, 2008 WL 4716958, at *11 (S.D. Fla. Oct. 23, 2008) (holding that a "Permission to Travel" document authorized travel, not permanent relocation, and that "in light of the significant consequences of one parent's granting consent for a minor child to permanently relocate to another country, these courts understandably require a clear and unequivocal statement of such intent before finding such consent"). *See also Horacius v. Richard*, 720 F. Supp. 3d 1287, 1297 (S.D. Fla. 2024) (holding that a father who understood travel to be temporary and purchased return airline tickets never consented to the child's permanent retention in the United States).

The notarized document here is precisely a travel authorization. It says nothing about permanent relocation. See also *Garcia v. Angarita*, 440 F. Supp. 2d 1364, 1380 (S.D. Fla. 2006) (holding that a petitioner's agreement to allow his children to travel to the United States for a brief visit did not constitute consent to their relocation). The Father's July 31, 2026, written notice to the SRE expressly revoked any arguable consent. *See Giampaolo v. Erneta*, 390 F. Supp. 2d 1269, 1283 (N.D. Ga. 2004) (refusing to construe a travel authorization as consent because the title indicated it authorized travel, not permanent relocation).

The Father also expressly revoked any arguable consent on July 31, 2026, by sending the SRE a formal notice declaring his non-consent to any extension of L.A.V.F.'s stay.

Moreover, the Mexican court's June 4, 2026, order ***denying*** the Mother's request to take L.A.V.F. abroad characterized taking him to the United States as a "change of residence," not a temporary visit. Retaining L.A.V.F. beyond the authorized period and without the Father's consent is wrongful retention generally under Mexican law as expressly under the June 4, 2026, order from the Michoacan court. It is thus a wrongful retention under Article 3 of the Convention.

### B. Immediately Before the Wrongful Retention, L.A.V.F.'s Habitual Residence Was Mexico

This is not a close call. L.A.V.F.'s habitual residence immediately before the wrongful retention was Mexico. He lived there from shortly after his birth in 2022 through his departure on June 30, 2026—a period of more than four years. Mexico was the only country in which he had any meaningful or sustained life experience. Furthermore, the Mexican court specifically ordered that the Mother could not change L.A.V.F.'s residence from Quiroga, Michoacan, Mexico.

L.A.V.F. lived with his Mother, who just before leaving for the United States expressly represented to the Mexican court that she lived in Quiroga, Michoacan, Mexico in order to invoke that court's jurisdiction. *See Código Familiar Para El Estado de Michoacán De Ocampo* (Family Code for the State of Michoacan de Ocampo) ("CFM") attached as **Exhibit N**; English translation attached as **Exhibit O**., art. 794 (providing that "the judge of the plaintiff's or petitioner's domicile shall have jurisdiction" of divorce proceedings). Likewise, when proceedings (such as the Mother's) require a judge to determine the support for a minor (such as L.A.V.F.), "the judge of the place of habitual residence of such

support recipients shall have jurisdiction to resolve the dispute." CFM, art. 795. Likewise, jurisdiction to determine the custody of a child is the judge "at the minor's habitual residence." CFM, art. 797. That is, by filing her divorce petition with the court in Michoacan, which also seeks support determinations by the judge, the Mother has *admitted and affirmatively asserted* that the habitual residence for herself *and for L.A.V.F.* is in Michoacan, Mexico.

L.A.V.F.'s home, extended family, friends, school, and daily routine were all in Mexico. He attended school there for two consecutive academic years, and the family was building a permanent home in Quiroga, Michoacán. He had no meaningful life in any other country.

The Supreme Court has held that a child's habitual residence depends on "the totality of the circumstances specific to the case." *Monasky v. Taglieri*, 589 U.S. 68, 78 (2020). Under *Monasky*, the inquiry is "fact-driven" and must be "sensitive to the unique circumstances of the case and informed by common sense." *Id.* at 78 (quoting *Redmond v. Redmond*, 724 F.3d 729, 744 (7th Cir. 2013)). No single fact is dispositive; rather, a child habitually resides where she is "at home." *Id.* Here, L.A.V.F. has only lived in Mexico.

The Eleventh Circuit has identified shared parental intent and the child's acclimatization—that is, the degree to which the child has become settled in a social environment—as relevant considerations within this totality-of-the-circumstances framework. See *Ruiz v. Tenorio*, 392 F.3d 1247, 1252–55 (11th Cir. 2004). Under *Ruiz*, acquiring a new habitual residence first requires a settled intention to

abandon the one left behind. *Id.* at 1253. Without shared, settled parental intent, courts should be slow to infer from school or social contacts that an earlier habitual residence has been abandoned. *Id.* at 1254. See also *Horacius v. Richard*, 720 F. Supp. 3d 1287, 1296 (S.D. Fla. 2024) (finding Canada remained the child's habitual residence despite the child having lived longer in the United States, because the parents lacked a shared settled intention to change the habitual residence and the mother's retention could not itself create a new one).

Under any standard, L.A.V.F.'s habitual residence is Mexico. He lived there from shortly after birth through June 30, 2026, with both parents' shared understanding that Mexico was his home. The Father never intended to abandon Mexico as L.A.V.F.'s habitual residence, and the trip to the United States was expressly temporary. *See also Bocquet v. Ouzid*, 225 F. Supp. 2d 1337, 1344 (S.D. Fla. 2002) (habitual residence focuses on the child's past experience and circumstances, not future parental intentions). A parent cannot create a new habitual residence by wrongfully removing or sequestering a child. See *Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001); *Diorinou v. Mezitis*, 237 F.3d 133, 141–42 (2d Cir. 2001).

L.A.V.F.'s habitual residence was unambiguously Mexico. He had no ties to the United States other than a birth certificate and citizenship, and he had not lived there since the few weeks of his life. The Mother's brief, unauthorized retention cannot change that answer. No other conclusion is possible.

### C. The Mother's Retention Breaches the Father's Custody Rights

Under Mexican law, both married parents hold joint *patria potestad* (parental authority). The Código Civil Federal [CCF] provides that *patria potestad* is exercised by the parents and that, if one parent ceases to exercise it, the other continues to do so. Código Civil Federal [CCF], arts. 414, 420 (Mex.). *See, also, Código Familiar Para El Estado de Michoacán De Ocampo* (Family Code for the State of Michoacan de Ocampo) ("CFM") attached as Exhibit N; English translation attached as Exhibit O. The CFM *authorizes* protective and cautionary *measures* during divorce proceedings*, including measures* necessary *to protect minor children*, and addresses provisional custody when such measures are sought. CFM, arts. 260, 870 (Mex.). A guardian is appointed automatically for minor children. CRM, art. 262, 434.

The CFM provides that "Parental authority is the set of rights, duties, and obligations recognized and granted by law to parents … with respect to their children … for the purpose of caring for, protecting, and raising them…." CFM, art. 395. Both parents have parental authority over their children. CFM, art. 398, 153. Parental authority cannot be waived. CFM, art. 426. When ruling on divorces, "the judge must rule on all matters relating to the rights and obligations inherent in parental authority." CFM, art. 271.

The CFM also provides that manipulating a minor's perception about the other parent with the intention to prevent, hinder, or destroy the minor's ties to one of their parents is a type of domestic violence, referred to as parental

alienation. CFM, art. 318. Parental alienation can be a reason for a court to revoke custody or other parental rights. CFM, art. 422, 435, 438. Parents are required to avoid acts that lead to the parental alienation of the minor. CFM, art. 405. A parent can lose custody of a child for unjustifiably refusing to allow the other parent to spend time with the children. CFM, art. 422.

Importantly, although no custody order is in effect yet, "[t]hose exercising parental authority, even if they do not have custody, have the right to visitation with their descendants." CFM, art. 436. The right of a parent to visit a child can only be revoked by court order. CFM, art. 439.

The CFM also provides:

> Article 874. When a minor is unlawfully removed from his or her habitual residence, transferred to another residence, or retained in a location other than that residence, the person, institution, or agency that exercises, individually or jointly, custody, legal guardianship, or cohabitation may request the courts to order the minor's return.
>
> "Unlawful abduction, removal, or retention" is defined as any act that affects a minor's rights to custody, legal guardianship, or cohabitation, and deprives the minor of such rights without the consent of the person, institution, or agency responsible for the minor's care, or that is carried out through physical or psychological violence or with malicious intent.

CFM, art. 874, 875. "Custody and legal guardianship shall encompass matters relating to the care of the minor and the decision regarding the minor's place of residence…." CFM, art. 875. An abducting parent infringes the other parent's rights of custody and can be liable for damages caused both to the minor and to the other parent. CFM, art. 905.

Similarly, the *Código Civil para el Estado de Quintana Roo* (Civil Code for the State of Quintana Roo), **Exhibit A-5, A-6** ("CCQROO") defines *patria potestad* as the rights and obligations concerning minor children and their

property; makes it nonwaivable absent judicial resolution; provides for its joint exercise by the father and mother; addresses custody when parents live separately; protects parent-child and ascendant-child contact rights; requires children subject to *patria potestad* to live with those exercising it or in a home or institution they designate; and permits one holder to represent the child in litigation subject to the other holder's express consent and judicial authorization when required to settle. CCQROO, arts. 991, 993, 994, 997, 997 Bis, 1000, 1004 (Mex.).

The notarized travel authorization itself references the Father's *patria potestad* under Código Civil Federal [CCF], arts. 414, 420 (Mex.). It therefore confirms that the Father holds custody rights requiring his consent for the child's travel and relocation.

In sum, neither parent may unilaterally change the child's residence or remove the child from the country without the other parent's consent or, since a divorce proceeding exists, the Michoacan court. *See De La Riva v. Soto*, 183 F. supp. 3d 1182, 1190 (M.D. Fla. 2016) ("The archetype of this conduct is the refusal by the noncustodial parent to return a child at the end of an authorized visitation period."). Although the Mother had acquired custody of L.A.V.F. through default, the Mexican divorce court ordered her not to take the child to the United States without first informing the Father of the divorce proceedings and providing him an opportunity to respond. The Mother has now violated that Mexican court's order.

The June 4, 2026 Mexican court order denying the Mother's request to take L.A.V.F. abroad confirms that the Father's custody rights could not be overridden unilaterally. The Mother's retention of L.A.V.F. in the United States without his consent breaches the Mexican court's order and, thus, those rights. *See Castro v. Martinez*, 872 F. Supp. 2d 546, 555 (W.D. Tex. 2012) (finding Mexican *patria potestad* constitutes "rights of custody" under the Hague Convention); *Whallon v. Lynn*, 230 F.3d 450, 459 (1st Cir. 2000) (holding that an unmarried father possessed custody rights under Mexican *patria potestad* where no judicial custody determination or formal custody agreement existed). *See also Moreno v. Martin*, No. 08-22432-CIV, 2008 WL 4716958, at *8–9 (S.D. Fla. Oct. 23, 2008) (holding that *patria potestad* under Spanish law constitutes custody rights under the Convention, and that even where one parent exercises day-to-day parental authority, the other parent retains authority over fundamental decisions including the child's place of residence); *Garcia v. Angarita*, 440 F. Supp. 2d 1364, 1379 (S.D. Fla. 2006) (recognizing *patria potestad* as providing for joint exercise of parental authority); *see also In re Hague Child Abduction Application*, No. 08-2030-CM, 2008 WL 913325, at *8 (D. Kan. Mar. 17, 2008) (holding that a married Mexican father possessed custody rights where no divorce or custody order existed and the parents had an informal arrangement under which the father saw the child frequently).

The Supreme Court's holding in *Abbott v. Abbott*, 560 U.S. 1, 10–11 (2010), that a *ne exeat* right—the right to consent before a child is taken from the country—

is a "right of custody" under the Convention applies with full force here: the Father's *patria potestad* includes the right to consent to L.A.V.F.'s international travel, as demonstrated by the requirement of a notarized travel authorization.

In granting a similar petition filed by a Mexican mother seeking return of her son to Mexico after the father wrongfully retained him after a visit, the Honorable Brian J. Davis held:

> While the parties do not have a custody agreement or enforceable judicial determination from Mexican authorities, Mexican law provides that pursuant to "patria potestas" parents are inherently imbued with custodial rights over their children. *See De La Riva*, 183 F. Supp. 3d at 1195. Among those rights are the parents' ability to determine where a child resides. When one parents attempts to change a child's residence, the moving parent must obtain consent from the other parent. *Id.*

*See Millanes Anaya v. Jean-Louis*, Case No. 3:20-cv-447-J-39MCR, Dkt. 28 at 7 (M.D. Fla. Jun. 10, 2020). In *Millanes Anaya*, there was no court order establishing custody or visitation or the parents. Here, the wrongful retention is even more compelling, because the Mexican court ordered the Mother not to take the minor child to Florida without the Father first being informed of the divorce proceeding and had an opportunity to respond, but the Mother violated that order.

### D. The Father Was Exercising Custody Rights at the Time of Retention

The Father was actively exercising his custody rights at the time of the wrongful retention. The requirement of "actual exercise" of custody rights is to be "liberally construed" and is satisfied by any indication that the parent was maintaining a parental role. *Asvesta v. Petroutsas*, 580 F.3d 1000, 1018 (9th Cir. 2009); *Bocquet v. Ouzid*, 225 F. Supp. 2d 1337, 1346 (S.D. Fla. 2002). *See also*

*Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996) ("if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child"); *Horacius v. Richard*, 720 F. Supp. 3d 1287, 1298 (S.D. Fla. 2024) (finding father exercised custody rights where he lived with the child, provided financial support, and attempted to maintain regular contact after returning to Canada); *see also Walker v. Kitt*, 900 F. Supp. 2d 849, 858 (N.D. Ill. 2012) (same).

Here, the Father's exercise of custody is demonstrated by overwhelming evidence: He traveled regularly from Tulum to Quiroga to spend time with L.A.V.F.; he attended school events, including the Father's Day celebration on June 26, 2026; he contributed to the construction of the family home, "Casa Liam"; he provided financial support for the child; he arranged and authorized the temporary trip — indeed, the very act of executing a notarized travel authorization is itself an exercise of custody rights; and he immediately sought the child's return when the Mother failed to honor the terms of the temporary travel.

As the Pérez-Vera Explanatory Report — the official commentary on the Hague Convention — makes clear, custody rights need not be exercised in a particular manner; a parent who maintains a role in the child's life is exercising those rights. The Father's conduct readily satisfies this standard.

### E. L.A.V.F. is Under Sixteen Years of Age

L.A.V.F. was born in 2022 and is four years old. *See* ¶ 2; Ex. A-2, A-3, B, C. He is well under the sixteen-year age limit established by Article 4 of the Hague Convention, so the Convention applies. *See Abbott*, 560 U.S. at 9.

### F. The Narrow Exceptions to Return Do Not Apply

The Convention's exceptions are limited and narrowly construed. None applies here.

#### *1. No Grave Risk Under Article 13(b)*

Article 13(b) permits refusal of return only where "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention art. 13(b). The exception is narrowly construed and places a heavy burden on the parent opposing return.

No grave risk exists. L.A.V.F. lived safely and healthily in Mexico for more than four years. He attended school, had friends, and was thriving. To the extent the Mother has alleged digital violence in the Mexican divorce proceeding, the Father contests that accusation. In any event, those allegations concern the Mother, not the child. An order of return sends L.A.V.F. to his country of habitual residence; it does not award custody to the Father. See *Walker v. Kitt*, 900 F. Supp. 2d 849, 861 (N.D. Ill. 2012) (holding that allegations of mistreatment directed at the mother had no bearing on whether the child faced a grave risk); *see also In re Hague Child Abduction Application*, No. 08-2030-CM, 2008 WL 913325, at *8 (D.

Kan. Mar. 17, 2008) (holding that domestic violence directed at a spouse, rather than the child, did not establish grave risk where the child was well-adjusted and the father had never abused the child).

Mexican courts are fully competent to address custody and impose any necessary protective measures upon L.A.V.F.'s return. See *Monasky v. Taglieri*, 589 U.S. 68, 82–83 (2020) (recognizing Article 13(b) as the Convention's mechanism for guarding children from harms, including domestic violence). Indeed, the Mexican court has already appointed a guardian for L.A.V.F. and required notice to the local prosecutor's office, as a matter of course for a divorce involving a minor child. Those sorts of ameliorative measures—such as protective orders or supervised visitation arrangements—could sufficiently reduce any risk so that the child may be safely returned. *Golan v. Saada*, 596 U.S. 666, 674–76 (2022).

Article 13(b) does not authorize a best-interests custody analysis by the district court here. *See Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996) ("The exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest."); *see also Walker*, 900 F. Supp. 2d at 862.

### 2. *No Settlement Under Article 12*

Article 12 permits a court to decline return based on settlement only when proceedings begin more than one year after the wrongful removal or retention and the child is "settled in its new environment." Convention art. 12. That exception

cannot apply: L.A.V.F. has been in the United States for approximately three months, and this Petition was filed well within the one-year period. He is not settled here.

### *3. No Consent or Acquiescence*

Article 13(a) permits refusal of return if the petitioner "had consented to or subsequently acquiesced in the removal or retention." Convention art. 13(a). This is an affirmative defense the Mother would have the burden of proving. *See Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1360 (M.D. Fla. 2002); *Friedrich v. Friedrich*, 78 F.3d 1060, 1070 (6th Cir. 1996); *see also In re Ahumada Cabrera*, 323 F. Supp. 2d 1303, 1312 (S.D. Fla. 2004) (holding that courts should be mindful to not find acquiescence where a parent is actually trying to obtain the return of the child).

The Father consented only to a temporary trip of two to four weeks; the immigration form declared a two-month stay. He never consented to permanent relocation. On July 31, 2026, he sent the SRE a formal written notice expressly declaring his non-consent to any extension. That unambiguous objection defeats any claim of acquiescence. *See Millanes Anaya v. Jean-Louis*, Case No. 3:20-cv-447-J-39MCR, Dkt. 28 at 10-11 (M.D. Fla. Jun. 10, 2020) (finding that "the Mother never acquiesced or consented to KJ remaining in Florida. Even if she had, the informal text messages and video conference between the parents in this setting are not enough to prove acquiescence or consent, especially given the skepticism owed in circumstances where a parent might agree to anything to obtain the return

of a child-even if that return is temporary.”). *See also Moreno v. Martin*, No. 08-22432-CIV, 2008 WL 4716958, at *19 (S.D. Fla. Oct. 23, 2008) (holding that the father’s visit, communication with daycare, and public interactions did not constitute acquiescence, and that vigorous efforts to obtain the child’s return were inconsistent with acquiescence); *Bocquet v. Ouzid*, 225 F. Supp. 2d 1337, 1350 (S.D. Fla. 2002) (“That [the petitioner] arranged visits in order to see [the child], and had an indirect way of communicating ... is insufficient to constitute the unequivocal acquiescence required to satisfy the Hague Convention.”).

#### *4. No Mature-Child Objection Under Article 13*

Article 13 permits consideration of the views of a child who "has attained an age and degree of maturity at which it is appropriate to take account of its views." Convention art. 13. L.A.V.F. is four years old. He has not attained the age or maturity for this exception to apply.

## V. RIGHT TO RECOVERY OF FEES, COSTS, AND OTHER EXPENSES

Article 26 of the Hague Convention provides that, upon ordering the return of a child, the court may direct the person who wrongfully removed or retained the child to pay the applicant's necessary expenses, including travel expenses, the costs of legal representation, and attorney's fees.

ICARA implements this mandate at 22 U.S.C. § 9007(b)(3), providing that "[a]ny court ordering the return of a child pursuant to an action brought under section 9003 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster

home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate." *See also* 28 U.S.C. § 1920.

The Father requests that this Court order the Mother to pay all necessary expenses, including attorney's fees, legal costs, and other expenses incurred in connection with this action.

## VI. CONCLUSION

For these reasons, the evidence is overwhelming: L.A.V.F. is being wrongfully retained in the United States in violation of the Father's custody rights under Mexican law. The Father is entitled to L.A.V.F.'s prompt return to Mexico under the Hague Convention and ICARA.

## WHEREFORE

Petitioner, Juan Antonio Vázquez Álvarez, respectfully requests that this Court, pursuant to 22 U.S.C. § 9004(a), grant the following relief:

1. Schedule an immediate ex parte conference with the Court to address the urgent nature of this matter;

2. Order the United States Marshals Service to locate L.A.V.F. and Respondent and to serve process upon Respondent;

3. Enjoin Respondent, or anyone working on her behalf, from removing L.A.V.F. from the jurisdiction of this Court pending resolution of this matter;

4. Order the U.S. Marshal, when serving process, to confiscate L.A.V.F.'s and the Mother's passports, visas, and any other travel related documents— United States and Mexican — for deposit in the registry of the Court, other than the Mother's Permanent Resident Card, or otherwise require Respondent to surrender her and the child's passports to the Clerk of Court — United States and Mexican — for both L.A.V.F. and Respondent;

5. Enjoin the Mother, and those acting in concert with her, to cooperate with the U.S. Marshal in turning over all such documents and from applying for or obtaining any new or replacement passport, visa, or other travel document for L.A.V.F. or herself;

6. Order Respondent to immediately disclose the current address and location of L.A.V.F. and to refrain from changing the child's residence during the pendency of this case without prior written permission of the Court;

7. Order Respondent to appear before this Court for an evidentiary hearing and to show cause why L.A.V.F. should not be promptly returned to Mexico;

8. Set an expedited final evidentiary hearing on the merits of this Verified Petition;

9. Order the prompt return of L.A.V.F. to Mexico, his country and place of habitual residence;

10. Order Respondent to pay Petitioner's necessary expenses, including court costs, legal fees, attorney's fees, and transportation costs, pursuant to Article 26 of the Hague Convention and 22 U.S.C. § 9007(b)(3); and

11. Order such other and further relief as this Court deems just and proper.

Respectfully submitted,

**HOLLAND & KNIGHT LLP**

/s/ Jennifer A. Mansfield
Jennifer A. Mansfield
Fla. Bar No. 0186724
50 N. Laura Street, Suite 3900
Jacksonville, FL 32202
Tel. (904) 353-2000
Fax (904) 358-1872
jennifer.mansfield@hklaw.com
camille.winn@hklaw.com

Evan D. Rosen
Fla. Bar No. 106640
100 N. Tampa Street, Suite 4100
Tampa, FL 33602
Tel. (813) 227-8500
Fax. (813) 229-0134
evan.rosen@hklaw.com
*Attorneys for Petitioner*

**VERIFICATION**

I, Juan Antonio Vázquez Álvarez, declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing factual allegations contained in the above document are true and correct.

*Yo, Juan Antonio Vázquez Álvarez, declaro (o certifico, verifico o declaro) bajo pena de perjurio bajo las leyes de los Estados Unidos de América que las alegaciones de hechos anteriores contenidas en el documento anterior son verdaderas y correctas.*

Executed (*firmado*) on this 31 day of October, 2026.

______________________________
Juan Antonio Vázquez Álvarez
*Petitioner*